Cite as 2020 Ark. 217

# SUPREME COURT OF ARKANSAS
No. CR-18-1057

|  |  |  |
|---|---|---|
| RODNEY HARMON | | **Opinion Delivered:** May 28, 2020 |
| | APPELLANT | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-15-702] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE CHARLES E. CLAWSON, |
| | APPELLEE | JR., JUDGE |
| | | <u>AFFIRMED; COURT OF APPEALS' OPINION VACATED</u>. |

**ROBIN F. WYNNE, Associate Justice**

Rodney Harmon was convicted of various drug and drug-related offenses and sentenced to an aggregate term of forty years' imprisonment. On appeal, Harmon argues that the trial court erred by (1) refusing to order the State to obtain a video recording of the search of Harmon's home and to identify the filmmakers; (2) denying Harmon's request for a continuance to obtain the video and identify the filmmakers; (3) granting the State's motion in limine to exclude testimony regarding the filmmakers' presence; (4) giving a nonmodel jury instruction on the methamphetamine-trafficking charge; and (5) allowing the State to play a recording of a controlled drug buy through an informant during the penalty phase of the trial. We affirm and vacate the opinion of the court of appeals.

I. *Background*

In September 2015, officers of the United States Drug Enforcement Agency, the Twentieth Judicial District Drug Task Force, and the Faulkner County Sheriff's Office executed a warrant for the search of Harmon's home. They found more than six pounds of methamphetamine, multiple firearms and ammunition, baggies, scales, and cash. An HBO documentary film crew was also present at the search under an agreement with law enforcement. The crew, which consisted of Craig and Brent Renaud and a camera operator, was working on a documentary called *Meth Storm*, which later aired on HBO. The filmmakers did not participate in the search, nor did they include footage of the search in the film. They were not included as witnesses in the report of the search given to prosecutors. The film's credits thanked the judge and deputy prosecuting attorney who handled Harmon's case.

For more than a year after the search took place, the prosecutor was unaware of the presence of the filmmakers. When she learned of their presence in January 2017, she contacted defense counsel, stating that she did not have any of the footage but providing contact information for Craig Renaud. Days later, Harmon moved for a continuance. At a hearing on the motion, Harmon argued that the filmmakers could be agents of the State. He argued that the footage could be relevant and subject to disclosure, and that he might want to file an amended motion to suppress, based on the contents of the footage. The prosecutor said that the State did not have the HBO footage and that she had unsuccessfully tried to contact HBO to obtain it. She also said she had given defense counsel the information she had. The trial court granted the continuance.

During the next several months, Harmon unsuccessfully sought the footage and the identities of the filmmakers present at the search. The prosecutor gave defense counsel additional contact information for the HBO legal department and DEA personnel who may have approved the presence of the film crew. About a month before trial, the trial court denied Harmon's request for an order requiring the State to obtain the video but issued an order to "whomever shall be in possession and/or ownership" of the video to provide it. On the first day of trial, the trial court denied Harmon's motion for a continuance until the video was obtained and people present identified. The court granted the State's motion in limine to prohibit mention of the filmmakers' presence at the search. After the court granted the State's motion, Harmon proffered testimony from LeAnn Bakr, the DEA agent present at the search, that a previously unidentified camera operator named "Cole" was present at the search. Bakr also testified that she chose not to include the filmmakers as witnesses in her search-warrant report. Johnny Sowell of the drug task force testified that, although he did not write the report, he would not have listed the filmmakers as witnesses if he had.

Before trial, the State moved to use a nonmodel jury instruction on the methamphetamine-trafficking charge. The State proffered a jury instruction that added a series of factors for the jury to consider on "purpose to deliver," pulled from the model instruction for a lesser-included offense. Harmon proffered the model instruction. Over Harmon's objection, the court gave the nonmodel instruction. The jury convicted Harmon of trafficking methamphetamine within 1,000 feet of a school-bus stop, simultaneous

3

possession of drugs and firearms, possession of drug paraphernalia, and maintaining a drug premises within 1,000 feet of a school-bus stop. During the penalty phase of the trial, the State moved to introduce recordings of drug purchases from Harmon allegedly made by Shannon Daniels, a confidential informant who was not present at trial. Over Harmon's objection that the evidence was more prejudicial than probative, the trial court allowed the evidence. Harmon was sentenced to an aggregate term of forty years' imprisonment.

Harmon timely appealed his convictions. On December 4, 2019, the court of appeals affirmed in part and reversed in part. *Harmon v. State*, 2019 Ark. App. 572, 591 S.W.3d 347. We granted Harmon's petition for review. When we grant a petition for review, we treat the appeal as if it had originally been filed in this court. *Stone v. Washington Reg'l Med. Ctr.*, 2017 Ark. 90, at 4, 515 S.W.3d 104, 107.

II. *Points on Appeal*

A. HBO Footage

For his first point on appeal, Harmon argues that the trial court abused its discretion by refusing to order the State to obtain the HBO video footage of the search of Harmon's home and to identify the filmmakers present. Harmon acknowledges that the State does not have an affirmative duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to produce evidence it does not have. But he contends that under Rules 17.1 and 17.4 of the Arkansas Rules of Criminal Procedure, the State was obligated to obtain the footage and the identities of the filmmakers. Rule 17.1(c) provides in relevant part that "[t]he prosecuting attorney shall, upon timely request, disclose and permit inspection, testing,

4

copying, and photocopying of any relevant material regarding (i) any specific searches and seizures." Rule 17.4(a) provides that "[t]he court in its discretion may require disclosure to defense counsel of other relevant material and information upon a showing of materiality to the preparation of the defense."

In arguing that it was the State's responsibility to provide the video, Harmon contends that the HBO filmmakers were state actors or agents of the state because they were present at the behest of law enforcement. We review rulings regarding alleged violations of discovery rules for abuse of discretion. *Hicks v. State*, 340 Ark. 605, 612, 12 S.W.3d 219, 223 (2000). Harmon relies on *Wilson v. Layne*, 526 U.S. 603, 614 (1999), in which the United States Supreme Court held that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant. Harmon argues that because the filmmakers were state actors or agents, the State had an obligation to obtain the video and identify who was present at the search.

Harmon does not provide convincing authority to support his contention that the filmmakers were state actors or state agents. The filmmakers were more than mere bystanders; they were present at the invitation of law enforcement. But that does not make them state actors or agents. Bakr and Sowell testified that the filmmakers did not participate in the search. *Wilson* is not on point. Any possible Fourth Amendment claim Harmon may have against law enforcement under *Wilson* stemming from the presence of

the filmmakers at the search is distinct from the State's discovery obligation to obtain the video and identify all individuals present.

Harmon cites a series of cases for the proposition that information held by the police is imputed to the prosecution. In *Williams v. State*, 267 Ark. 527, 593 S.W.2d 8 (1980), the defendant made an incriminating statement in the presence of a police officer. The prosecutor learned of the statement the evening before trial but did not disclose it to the defense until after voir dire the next day. We concluded that because the defendant made the statement in the police officer's presence, the officer's knowledge of the statement was imputed to the prosecution. *Id.* at 531, 593 S.W.2d at 10. Likewise, in *Lewis v. State*, the State called a witness whom the prosecutor had learned about the morning of the trial. Because the witness had given crucial information to the police, we concluded that information was imputed to the prosecution. 286 Ark. 372, 375, 691 S.W. 2d 864, 865 (1985). Harman argues that because law enforcement knew about the presence of filmmakers during the search, that knowledge is imputed to the prosecution, which had a duty to disclose the footage under Rule 17. We disagree. While we recognize that information held by the police is imputed to the prosecution, in this case the police did not possess the footage and did not take statements from the filmmakers. The State did not call the filmmakers as witnesses or introduce the footage into evidence. Plus, the prosecutor disclosed the existence of the footage and contact information for the filmmakers more than a year before trial.

Harmon also argues that the presence of the filmmakers at the search of his home is

analogous to the presence of witnesses at the taking of a custodial statement. We have held that the State must produce all witnesses present at the taking of a custodial statement or explain their absence, *Foreman v. State*, 328 Ark. 583, 590, 945 S.W.2d 926, 930 (1997). But the taking of a custodial statement is not the same as the search of a home. And the State did disclose the presence of the filmmakers. Under these circumstances, we decline to extend our holding in *Foreman* to include witnesses present at the execution of a search warrant who did not participate in the search.

The State cites *Barrow v. State*, 2010 Ark. App. 589, 377 S.W.3d 481, to support its contention that Rule 17 does not require it to produce the video. In *Barrow*, there was evidence of the victims' medical treatment at area hospitals that the State did not disclose to the defense. The court of appeals held that "[b]ecause the medical facilities are not law-enforcement agencies, the prosecutor had no obligation to obtain the records under Rule 17.3. In the absence of a showing . . . that the State had access to the records, no discovery violation occurred." *Id.* at 15, 377 S.W.3d at 491. According to the State, the evidence held by the filmmakers is akin to evidence held by the hospitals in *Barrow*.

We agree. The filmmakers were not law-enforcement officers, nor were they acting as state agents. Because the State did not possess the video, we find no discovery violation. It is undisputed that neither the police nor the prosecution had the video. As soon as she found out about the presence of the filmmakers, the prosecutor informed defense counsel and provided contact information for one of the filmmakers. She also attempted to get the video herself and later provided additional contact information for relevant individuals at

7

HBO and the DEA more than a year before trial. The question is not whether the State could have done more to get the video; it is whether the trial court abused its discretion by not ordering the State to do so. We conclude the trial court did not abuse its discretion in declining to order the State to obtain the video.

## B. Continuance

Next, Harmon argues that the trial court abused its discretion by denying the defense's request for a continuance to obtain the video and the identity of the filmmakers present. He argues that he made good-faith efforts to obtain the evidence and was prejudiced without having it at trial. He tried to obtain the video—he contacted counsel for HBO, which declined to produce the footage without an order, contacted the Renauds' company, and attempted to serve Craig Renaud—but was ultimately unsuccessful.

We review the denial of a continuance for abuse of discretion. *Price v. State*, 365 Ark. 25, 33, 223 S.W.3d 817, 824 (2006). A trial court should consider the following factors in deciding whether to grant a continuance: (1) the diligence of the movant; (2) the probable effect of the testimony at trial; (3) the likelihood of procuring the attendance of the witness in the event of a postponement; and (4) the filing of an affidavit, stating not only what facts the witness would prove, but also that the appellant believes them to be true. *Miller v. State*, 328 Ark. 121, 124, 942 S.W.2d 825, 827 (1997).

The trial court did not abuse its discretion in denying Harmon's request for a continuance. Harmon knew about the existence of the footage for about sixteen months before trial. He made multiple attempts to get the video. The need for an order was

discussed with the trial court during the October 2017 hearing on Harmon's motion to continue. The State agreed to the continuance, and the prosecutor said she was "willing to do whatever is necessary" for Harmon to get the video. But there is nothing in the record that shows Harmon made efforts to obtain an order until the trial court issued it in May 2018, less than a month before trial. There is no evidence that he attempted to subpoena HBO. We find that there is little likelihood that he could obtain the evidence if given another continuance. Plus, there is no evidence about the probable effect of the evidence at trial. We acknowledge that Harmon only learned of the identity of a camera operator named "Cole" from Bakr's proffered testimony on the first day of trial. But Harmon knew for more thana year that HBO filmmakers had been present; that he did not know the first name of the camera operator did not merit a continuance under these circumstances.

## C. Motion in Limine

Harmon argues that the trial court abused its discretion by granting the State's motion in limine to exclude testimony regarding the presence of the HBO filmmakers. He argues that trial references to absent witnesses are a proper subject of argument, citing *Bullock v. State*, 317 Ark. 204, 876 S.W.2d 579 (1994), and *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998), for the proposition that references to absent witnesses imply those witnesses have something to hide. He contends that the presence of undisclosed witnesses at the scene of the offense and the fact that the search was recorded but the footage was not provided raises the inference that law enforcement wanted to conceal their presence, showing reasonable doubt.

9

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. *Vance v. State*, 2011 Ark. 392, at 6, 384 S.W.3d 515, 519. Under Arkansas Rule of Evidence 403, a trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The trial court did not abuse its discretion in granting the State's motion to exclude testimony about the film. The cases Harmon cites, *Bullock* and *Noel*, can be distinguished. In both cases, the defendant gave alibi testimony—Bullock testified that he worked and received a paycheck on the day of the offense, and Noel gave names of alibi witnesses. In closing arguments, the State pointed out holes in that testimony—Bullock did not produce the paycheck, and Noel did not call the witnesses. In both cases, the trial court declined to declare a mistrial, and we affirmed. These cases examine how the failure to produce alibi evidence undermines the credibility of defendants who testify. *Bullock*, 317 Ark. at 206, 876 S.W.2d at 580–81; *Noel*, 331 Ark. at 89, 960 S.W.2d at 444. That is not the issue here.

Testimony that filmmakers were present at the search could possibly be relevant to whether there was reasonable doubt about what happened during the search in the absence of the footage or testimony from the filmmakers. But the trial court could conclude that the risk of confusion substantially outweighed any probative value. Neither party planned to introduce any footage; indeed, neither party had any footage. The filmmakers played no role in the search; they merely observed it. Harmon's argument that law enforcement had

10

something to hide is undercut by the prosecutor's prompt disclosure of the filmmakers' presence well over a year before trial. We conclude that the trial court did not abuse its discretion on this point.

D. Nonmodel Jury Instruction

Next, Harmon argues that the trial court abused its discretion by allowing a nonmodel jury instruction on the methamphetamine-trafficking charge. The State requested a nonmodel instruction on this charge, which added six factors that the jury could consider in determining whether Harmon had "purpose to deliver" to the model trafficking instruction, Arkansas Model Jury Instruction–Criminal 2d 64.440. Harmon objected to the State's request for a nonmodel instruction and proffered AMI Crim. 2d 64.440 as written. The instruction given to the jury read as follows (the nonmodel portions are underlined):

> Rodney Harmon is charged with the offense of trafficking methamphetamine. To sustain this charge, the State must prove beyond a reasonable doubt; first, that Rodney Harmon possessed or possessed with the purpose to deliver more than 200 grams by aggregate weight including an adulterant or dilutant of methamphetamine; and second, that he did so knowingly or purposely.
>
> Purpose to deliver may be shown by evidence that you find beyond a reasonable doubt proves Rodney Harmon's purpose to deliver methamphetamine. The evidence which you may consider along with all the facts and circumstances of the case include any of the following factors:
>
> • Defendant possessed the means to weigh, separate, or package methamphetamine; or
>
> • Defendant possessed a record indicating a drug related transaction; or

11

- The methamphetamine was separated and packaged in a manner to facilitate delivery; or

- Defendant possessed a firearm that was in his immediate physical control at the time of the possession of the methamphetamine; or

- The Defendant possessed at least two other controlled substances in any amount; or

- Other evidence that contributes to prove the Defendant's purpose was to deliver methamphetamine.

And these definitions are applicable:

Knowingly, a person acts knowingly with respect to his conduct or attendant circumstances when he is aware that his conduct is of that nature or that such circumstances exists. A person acts knowingly with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result.

Possession, there are two kinds of possession, actual and constructive. Actual possession of a thing is a direct physical control over it. Constructive possession exists when a person, although not in actual possession of that thing, has a right to control it and intends to do so. If two or more persons share actual or constructive possession of a thing, either or both may be found to be in possession.

Purposely, a person acts purposely with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result.

This instruction essentially imports the purpose-to-deliver language from an instruction on a lesser-included offense—possession with intent to deliver—also given to the jury.

Harmon argues that a nonmodel instruction should be given only when the trial judge finds that the model instruction does not accurately state the law or does not contain an instruction on the subject. *Ventress v. State*, 303 Ark. 194, 197, 794 S.W.2d 619, 620 (1990). There is a model instruction on the trafficking charge—AMI Crim. 2d 64.440—so

12

the question is whether the instruction accurately states the law. AMI Crim. 2d 64.440 tracks the language of Arkansas Code Annotated § 5-64-440—trafficking a controlled substance. Therefore, Harmon argues, the trial court did not have discretion to give a nonmodel instruction.

We will not reverse a trial court's ruling on whether to submit a jury instruction absent an abuse of discretion. *Kinsey v. State*, 2016 Ark. 393, at 9, 503 S.W.3d 772, 778. A nonmodel jury instruction is to be given only when the model instruction does not correctly state the law or there is no model instruction on the subject. *Pokatilov v. State*, 2017 Ark. 264, at 8, 526 S.W.3d 849, 856. Moreover, a trial court cannot modify a model instruction unless it is clear that the model instruction incorrectly applies the law to the facts. *Moore v. State*, 317 Ark. 630, 635, 882 S.W.2d 667, 669 (1994).

We reiterate our long-standing rule that a trial court should not give a nonmodel instruction unless the court concludes that the model instruction does not accurately state the law. *See, e.g., Fincham v. State*, 2013 Ark. 204, at 5, 427 S.W.3d 643, 647. Here, the model instruction on trafficking proffered by Harmon accurately states the law. It tracks the trafficking statute, Ark. Code Ann. § 5-64-440, which does not include the purpose to deliver factors. The AMCI 2d 64.440 "Note on Use" explains that this exclusion was intentional:

> Possession with the purpose to deliver was added to trafficking in Act 529 of 2013, section 4, and the legislation did not include the factors to be considered. Compare section 5 of Act 529 which lists factors with respect to Ark. Code Ann. § 5-64-442 and Ark. Code Ann. § 5-64-420. The committee has followed Act 529 and has not included the factors in this instruction.

13

We conclude that the trial court gave an erroneous instruction.

The question then is whether that error is harmless. An appellant is not required to demonstrate prejudice when the trial court gives an erroneous instruction involving the trial mechanism to be used in deciding a civil or criminal case. *Skinner v. R.J. Griffin & Co.*, 313 Ark. 430, 434, 855 S.W.2d 913, 916 (1993). However, we also explained that "an appellee may demonstrate that the giving of an erroneous instruction was harmless, and we would affirm. Some examples of this are where the jury demonstrably was not misled because the jury rejected the theory of the erroneous instruction, or where the erroneous instruction was obviously cured by other correct instructions." *Id.* at 435, 855 S.W.2d at 916 (internal citations omitted).

We conclude that this erroneous instruction was obviously cured by other instructions. The jury was instructed on the purpose-to-deliver factors—which they could consider in the trafficking offense—in an instruction on the lesser-included offense of possession with intent to deliver a few pages later. Harmon does not dispute that these factors are legally accurate. The inclusion of these factors in the instruction on the trafficking offense merely meant that that jurors would not have to flip back and forth between instructions when considering the factors. Under these circumstances, we cannot see how Harmon was prejudiced by the nonmodel trafficking instruction. Therefore, we conclude that the giving of the nonmodel instruction was harmless error.

E. Witness Testimony

14

Finally, Harmon argues that the trial court abused its discretion by allowing the State, during the penalty phase of the trial, to play a recording of a drug purchase from Harmon allegedly made by Shannon Daniels, a confidential informant who was not present to testify. Harmon contends that this evidence was more prejudicial than probative and should have been excluded under Arkansas Rule of Evidence 403.

We review the trial court's admission of evidence in the penalty phase of a trial for abuse of discretion. *MacKool v. State*, 365 Ark. 416, 456, 231 S.W.3d 676, 706 (2006). Evidence may be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Ark. R. Evid. 403. On appeal, Harmon merely restates his claim below that this evidence was more prejudicial than probative. He fails to state more than conclusory allegations, nor does he develop his argument. This court does not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *See, e.g.*, *Armstrong v. State*, 366 Ark. 105, 109, 233 S.W.3d 627, 631 (2006). We find no abuse of discretion in the trial court's admission of this testimony.

Affirmed; court of appeals' opinion vacated.

BAKER, HART, and WOOD, JJ., dissent.

**RHONDA K. WOOD, Justice, dissenting.** The Fourth Amendment prohibits the media and other unauthorized third parties from accompanying law enforcement into a home during execution of a warrant. *Wilson v. Layne*, 526 U.S. 603 (1999). The *Wilson* opinion, written by Chief Justice Rehnquist and joined by Justices O'Connor, Scalia,

Kennedy, Souter, Thomas, and Ginsburg, explained that media ride-alongs further no legitimate law enforcement purpose and

> ignore the importance of the right to residential privacy at the core of the Fourth Amendment. Were such generalized law enforcement objectives themselves sufficient to trump the Fourth Amendment, the protections guaranteed by that Amendment's text would be significantly watered down.

*Id.* at 612 (cleaned up).

Despite *Wilson*'s clear holding, in 2015, HBO filmmakers accompanied the DEA and the Twentieth Judicial District Drug Task Force while they executed a search warrant at Harmon's residence. The search warrant did not authorize the presence of any third parties. Drug Task Force member Johnny Sowell testified that the filmmakers entered Harmon's home and surrounding premises. He stated that the filmmakers likely knew about the search because either he or a DEA agent notified them. Sowell stated that he often briefed the filmmakers on the task force's operations so they could film them. This search violated the Fourth Amendment.

The record does not reflect that the State made any significant attempt to obtain or retain the unconstitutionally created footage as evidence. The State did not even disclose the ride-along until January 2017, one month before the scheduled jury trial. While the circuit court did at first grant Harmon continuances, it placed the burden on Harmon to locate the film footage. The film footage is relevant because, before the January 2017 disclosure of the ride-along, Harmon had filed a motion to suppress and challenged the search on Fourth Amendment grounds. I believe it was error for the circuit court to place

16

this burden on Harmon, particularly given the constitutional violation and Harmon's challenge to the search. For these reasons, I respectfully dissent.

Our discovery rules require the State to disclose and permit inspection of "any relevant material regarding . . . any specific searches and seizures." Ark. R. Crim. P. 17.1(c). The rules also provide that the circuit court "may require disclosure to defense counsel of other relevant material and information upon a showing of materiality to the preparation of the defense." Ark. R. Crim. P. 17.4(a). When a party violates a discovery rule, the court may exercise any of these options: order that party to permit the discovery or inspection of materials not previously disclosed; grant a continuance; prohibit the party from introducing the material; or enter another order that the court finds proper under the circumstances. Ark. R. Crim. P. 19.7. It is within the circuit court's discretion which sanction to employ. *Hicks v. State*, 340 Ark. 605, 612–13, 12 S.W.3d 219, 224 (2000).

This case does not involve a Fourth Amendment issue on appeal. But *Wilson* is relevant because of Harmon's stated purpose for the footage. Early in the case, Harmon moved to suppress the fruits of the search, and the State filed a response. At that time, law enforcement knew HBO had filmed the search. Yet the State did not inform Harmon of the possible existence of the film footage until 2017, did not aggressively help him obtain it, and did not fully disclose the names of everyone present until the day of trial. It was not until the DEA agent's proffered testimony at trial that the defense discovered the presence of another HBO-affiliated person named "Cole." The State had a duty to disclose Cole's presence well before when Harmon requested it during discovery. The DEA agent's

17

knowledge is imputed to the prosecution, and the State's failure to disclose until the day of trial constitutes a discovery violation.

We have granted relief in similar cases. For example, we reversed and remanded for a new trial when the State did not disclose a witness until the day of trial, even after the defense's timely discovery motion. *Lewis v. State*, 286 Ark. 372, 374, 691 S.W.2d 864, 865 (1985). We also reversed and remanded for a new trial when the State failed to disclose an exculpatory statement in the possession of the police, reasoning as follows: "Even if the statement was not in the prosecutor's open file, the statement was imputed to the prosecution and disclosure was required." *Lacy v. State*, 272 Ark. 333, 335, 614 S.W.2d 235, 236 (1981). We also reversed and remanded for a new trial where, again, the State disclosed on the day of trial adverse testimony of a witness. *Williams v. State*, 267 Ark. 527, 532, 593 S.W.2d 8, 11 (1980). Likewise, in this case, Harmon did not know about Cole's presence until the day of trial. This information, if provided earlier, would have given Harmon another lead to locate the video footage.

Even so, the burden to locate the footage should not have fallen on Harmon exclusively. The circuit court's ineffectual order directed only "whomever shall be in possession and/or ownership" to turn over the footage. The court placed no affirmative burden on the State. And, as the proffered testimony showed, the filmmakers did not just stumble onto the scene. Law enforcement invited HBO to the raid. Indeed, the State's cooperation with HBO resulted in a special thanks in *Meth Storm*'s closing credits to the then-elected prosecuting attorney and deputy prosecuting attorney handling Harmon's

18

case. It is startling that the majority gives no credence to the legitimate argument that HBO would be more responsive to these favored entities as opposed to Harmon's defense counsel. Under Rule 17.4, the circuit court should have exercised its discretion and ordered the State to obtain the footage, which but for the Fourth Amendment violation would never have existed.

I conclude these discovery violations entitle Harmon to a new trial. Without the footage, one cannot say whether it would contain relevant or exculpatory evidence. The court's failure to require its disclosure—in the face of a constitutional violation—provides sufficient grounds to reverse. The court failed to adequately address the State's futile efforts to turn over relevant information in the hands of its agents or in the hands of filmmakers who were intimately involved with an unconstitutional search. If the footage could not be located, after the State's diligent and meaningful efforts, then Harmon should have been free to discuss it during trial.

BAKER and HART, JJ., join.

*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.

19